**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN FISHER,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 24-4264** |
| | : | |
| **THE BOEING COMPANY,** | : | |
| **Defendant.** | : | |

---

**Diamond, J.**                                                                                      **March 21, 2025**

<u>**MEMORANDUM OPINION**</u>

John Fisher alleges that The Boeing Company fired him in violation of the Americans with Disabilities Act and the Family and Medical Leave Act.  42 U.S.C. § 12101 et seq.; 29 U.S.C. § 2601 et seq.; (Doc. No. 1;  Doc. No. 21 at 1.)  He bases his claims on his poor relationship with a supervisor, who had no role in firing him.  (<u>See</u> Doc. No. 21 at 2-3.)  Because those who made the decision to fire him did so because Fisher had, by his own admission, committed time theft when working on government contracts, his termination was permissible.  (<u>See</u> Deposition of John Fisher, Doc. No. 17-3, 248:8-19.)  Accordingly, I will grant Boeing's Motion for Summary Judgment.  (Doc. No. 17.)

## I.    FACTUAL BACKGROUND

I have construed the facts and resolved all factual disputes in Fisher's favor.

### *Fisher's Work Assignments and Supervisors*

In June 1988, Boeing hired Fisher as a Sheet Metal Assembler at its Ridley Park facility.  (Def.'s Statement of Facts, Doc. No. 17-2, ¶¶ 1-2.)  Fisher then joined UAW Local 1069, the factory's union for hourly production and maintenance employees.   (<u>Id.</u> ¶¶ 8-10.)

Throughout his Boeing employment, Fisher worked on various projects, including those arising from government contracts for aircraft such as the D-47 Chinook and V-22 Osprey.  (<u>Id.</u> ¶¶

12-13.)  During his last two years at Boeing, Fisher worked mostly on projects for contracts between Boeing and either the United States or foreign governments.  (Id. ¶¶ 13-17.)  Fisher usually worked Second Shift: from 2:30 p.m until 11:00 p.m.  (Id. ¶¶ 7, 21; see also Def.'s Mot. Summ. J., Ex. MM, Doc. No. 19-14.)  He was initially supervised by the Second Shift Manager, but also received work assignments from Senior Operations Manager Danielle Pratt.  (Def.'s SOF ¶¶ 24, 26, 27; see also Pl.'s Resp. to Def.'s SOF, Doc. No. 21-3, ¶ 27; Deposition of Danielle Pratt, Doc. No. 21-7, 9:8-10.)  When the Second Shift Manager retired in February 2023, Boeing did not hire a replacement, leaving Fisher supervised primarily by Flightline Operations Manager William Buchanan.  (Def.'s SOF ¶¶ 22, 24, 25; Pl.'s Resp. to Def.'s SOF ¶ 22.)  Fisher nonetheless continued to receive assignments directly from Pratt.  (Pl.'s Counterstatement of Facts, Doc. No. 21-3, ¶ 9; Def.'s Resp. to Pl.'s CSOF, Doc. No. 27-1, ¶ 9.)

Beginning in November 2022, new work fell off at the Ridley Park facility.  (Def.'s SOF ¶ 105; Pl.'s Resp. to Def.'s SOF ¶ 91.)  Boeing consequently announced a Voluntary Layoff Program, which employees could request.  (Def.'s SOF ¶¶ 105-08.)  Fisher did not.  (See Pl.'s CSOF ¶ 15.)  By early 2023, he was deemed "underutilized."  (Id. ¶ 10.)  He nonetheless continued to report to work and received some assignments from Pratt.  (Def.'s Mot. Summ. J., Ex. V, Doc. No. 17-24; Ex. W, Doc. No. 17-25; Ex. MM.)

***Fisher Takes Medical Leaves From 2017 to 2023***

Boeing's Labor Recording Practices Policy requires that employees accurately record their work schedules in the Company's timekeeping system, and obtain approval for any changes.  (Def.'s SOF ¶ 40-41; Def.'s Mot. Summ. J., Ex. J, Doc. No. 19-10.)  The Policy provides that "[e]mployees falsifying labor charging or managers who knowingly approve such falsifications are subject to company disciplinary action . . . and possible civil and/or criminal liabilities."  (Def.'s

SOF ¶ 44; Def.'s Mot. Summ. J, Ex. J at 4.)  Fisher received annual training on this Policy.  (Def.'s SOF ¶ 46; Def.'s Mot. Summ. J., Ex. K, Doc. No. 17-13.)

Boeing also had a Leave of Absence Policy by which employees could take up to twelve weeks of unpaid leave under the Family and Medical Leave Act.  (Def.'s SOF ¶ 53, see also Def.'s Mot. Summ. J., Ex. L, Doc. No. 19-12.)  Although these twelve weeks could be taken continually or intermittently, employees were required accurately to record all FMLA leave on their timecards. (Def.'s SOF ¶¶ 54, 58.)

In 2017, Fisher took FMLA leave because of his skin ailments.  (Def.'s SOF ¶ 71; Pl.'s Resp. to Def.'s SOF ¶ 71.)  He took leave intermittently from May 5, 2017 to November 4, 2017. (Def.'s SOF ¶ 73; Pl.'s Resp. to Def.'s SOF ¶ 71.)  In early 2022, Fisher was hospitalized for eczema and folliculitis with infections.  (Fisher Dep. 290:20-291:4; Def.'s Mot. Summ. J., Ex. R., Doc. No. 19-16; Pl.'s CSOF ¶ 1; Def.'s Resp. to Pl.'s CSOF ¶ 1.)  He received continual leave for this hospitalization from March 8, 2022 to March 24, 2022.  (Def.'s SOF ¶ 74; Def's Mot. Summ. J., Ex. Q, Doc. No. 17-19.)  Fisher was approved for intermittent leave from September 29, 2022 through October 17, 2022.  (Def.'s SOF ¶ 75.)  He received a third period of intermittent FMLA leave from December 6, 2022 to March 27, 2023.  (Id. ¶ 76.)  His final period of approved FMLA leave expired on March 27, 2023, after which he returned to work as a Sheet Metal Assembler. (Id. ¶¶ 79, 81; Pl.'s Resp. to Def.'s SOF ¶¶ 79, 81.)  The only accommodation he ever sought for his skin conditions was FMLA leave.  (Def.'s SOF ¶ 88.)

Buchanan did not know of Fisher's skin disorders.  (Id. ¶ 87.)  He knew only that Fisher had taken FMLA leave, but did not know why.  (Id. ¶ 83.)  Pratt was aware that Fisher had skin problems that caused him to miss work.  (Pl.'s CSOF ¶ 12.)  The Parties dispute whether she was

aware that Fisher ever took FMLA leave.  (<u>Compare</u> Def.'s SOF ¶ 84 <u>with</u> Pl.'s Resp. to Def.'s SOF ¶ 84.)

On March 22, 2023, Pratt directed Fisher to complete a "priority" project by the next day. (Pl.'s Mot. Opp. Summ. J., Ex. G, Doc. No. 21-10.)  Fisher, who was still on FMLA leave, believes that when he could not comply, his relationship with Pratt became "worse."  (Fisher Dep. 312:24-313:07.)  Although Fisher testified that Pratt then stopped giving him any work, Boeing's records show that Fisher continued to receive assignments from Pratt through at least April 2023. (<u>Compare</u> Pl.'s CSOF ¶ 21 <u>with</u> Def.'s Mot. Summ. J., Exs. V, W, MM.)

### *Fisher's Attendance Problems*

It is undisputed that Fisher's attendance was poor irrespective of his FMLA leave.  He received verbal warnings about unexcused absences on November 19, 2015; December 16, 2016; and November 14, 2017.  (Def.'s SOF ¶ 95.)  He received a written warning for missing work on August 23, 2018.  (<u>Id.</u> ¶ 96.)  Each of these absences occurred outside Fisher's periods of FMLA leave.  Additionally, on May 5, 2023, Buchanan received an email from Boeing with a list of employees—including Fisher—who had poor attendance records over the previous year.  (<u>Id.</u> ¶ 98; <u>see also</u> Def.'s Mot. Summ. J., Ex. HH, Doc. No. 19-7.)  That same day, Buchanan spoke with Fisher about his poor attendance and frequent absences and lateness.  (Def.'s SOF ¶ 100; Pl.'s CSOF ¶ 41; Def.'s Mot. Summ. J., Ex. EE, Doc. No. 19-4 at *5.)

Pratt was frustrated by Fisher's poor attendance.  She testified that Fisher's "failure to consistently come to work" was "not a secret," and that it was "certainly not a secret that [Fisher] did not have good attendance."  (Pratt Dep. 130:6-9; 130:16-18.)  On January 26, 2023—when Fisher had been approved for intermittent leave—Pratt remarked to Buchanan about Fisher's

lateness: that Fisher "graced us with his presence at 3pm.  He is a hard man to track down though." (Pl.'s Mot. Opp. Summ. J., Ex. P, Doc. No. 21-19.)

It appears that Pratt disliked Fisher.  On March 23, 2023, in response to an email about cost overruns on a particular job, Pratt wrote that "I think this may be a John Fisher special."  (Pl.'s Mot. Opp. Summ. J., Ex. H, Doc. No. 21-11; see also Pl.'s CSOF ¶ 23.)  In April or May of 2023, Pratt refused Fisher's help with changing a tire on her car, but accepted help from a different employee.  (Pl.'s CSOF ¶ 30.)

### *Fisher Commits Time Theft And Is Fired*

On May 5, 2023—the same day Fisher spoke with Buchanan about his repeated lateness and absences—Fisher's first line supervisor Zakaria Rehawi became aware of discrepancies in Fisher's time records.  (Def.'s Mot. Summ. J., Ex. JJ, Doc. No. 17-38, ¶¶ 4, 9.)  Rehawi knew nothing about Fisher's FMLA leaves and was not acting at Pratt's direction.  (Id. ¶¶ 9-12; Def.'s SOF ¶ 116.)  Pursuant to the Boeing Code of Conduct—requiring the reporting of misconduct— Rehawi informed Pratt of the discrepancies.  (Def.'s Mot. Summ. J., Ex. JJ ¶ 13.)  Also following the Code of Conduct, Pratt submitted an "intake" (i.e. inquiry) request to Boeing's Ethics Line, reporting that Fisher "may not be accurately recording [his] time." (Def.'s SOF ¶ 118; Pl.'s CSOF ¶ 24; Def.'s Mot. Summ. J., Ex. KK, Doc. No. 19-11.)  The request triggered further investigation. (See Def.'s Mot. Summ. J., Ex. EE.)

Fisher was one of ten employees as to whom Pratt made an intake request during her five years as Senior Operations Manager.  (Def.'s Resp. to Pl.'s CSOF ¶ 31; Pratt Dep. 9:2-10; 54:10- 14.)  Two of these intakes were for disabled individuals: Fisher, and Sheet Metal Assembler Neal Neri, who has Hypochondroplasia (or "short arm").  (Def.'s Resp. to Pl.'s CSOF ¶ 32; see also Pl.'s Mot. Opp. Summ. J., Ex. I, Doc. No. 21-12, ¶ 7.)  Neri avers that Pratt once remarked that his

disability should allow him to go to the front of a cafeteria line. (Pl.'s Mot. Opp. Summ. J., Ex. I ¶ 16; <u>see also</u> Pl.'s CSOF ¶ 35.) Fisher also believes that Pratt submitted an intake for disabled employee Sam Ramble, although this is unclear. (Pl.'s CSOF ¶ 32; <u>see also</u> Def.'s Resp. to Pl.'s CSOF ¶ 32.) It is undisputed, however, that Ramble was terminated after the intake. (Pratt Dep., 38:9-18.) Pratt's intake requests led to the termination of Fisher and another employee who was not disabled. (Def.'s Resp. to Pl.'s CSOF ¶ 33; Pratt Dep. 55:14-56:22.)

Fisher's intake was investigated by Senior Corporate Investigator Brian Jones, who found that in a single pay period Fisher had fraudulently recorded 12 of 43 hours—27.9% of his total time. (Def.'s SOF ¶¶ 121, 127; Def.'s Mot. Summ. J., Ex. EE at *3.) Jones determined that Fisher had accessed Boeing's timekeeping system and altered his previous entries for the twelve hours for which he had taken "Leave Without Pay" to entries attributing that time to work orders on United States government projects, thus enabling Fisher to get paid for 12 hours that he did not work. (Def.'s SOF ¶¶ 128-32; Def.'s Mot. Summ. J., Ex. EE at *2.) Fisher did not deny this fraud when he spoke to Jones. (Def.'s Mot. Summ. J., Ex. EE at *4-5; <u>see also</u> Def.'s SOF ¶ 133.) Rather, as he later explained, he altered the time records because he was trying to prevent being fired for poor attendance. (Def.'s SOF ¶ 133; Fisher Dep. 248:8-249:18.) After the Jones interview, Fisher completed a Prior Pay Period Adjustment form to reimburse Boeing for the phony entries. (Def.'s SOF ¶ 135; Def.'s Mot. Summ. J., Ex. NN, Doc. No. 19-15.) The day he filled out the form, he texted Buchanan that he needed "to fill out a prior week adj[ustment] form," but followed up with "Well it's probably to[o] late now I'm already in trouble." (Def.'s Mot. Summ. J., Ex. OO, Doc. No. 17-43.)

Jones submitted his findings to a four-person Employee Corrective Action team; neither Pratt nor Buchanan was a member. (Def.'s SOF ¶ 142.) The team decided to fire Fisher, and on

May 25, 2023, notified him that he was being discharged for "violat[ing] our labor recording compliance requirements by failing to enter your time correctly . . . resulting in mischarging to a government contract." (Id. ¶¶ 148, 150; Def.'s Mot. Summ. J., Ex. YY, Doc. No. 19-21.)

Local 1069 filed a grievance contesting Fisher's discharge. (Def.'s SOF ¶ 161.) A week before the grievance hearing, Pratt and Buchanan attended a meeting about Fisher's termination. (Pl.'s CSOF ¶ 28.) Fisher has offered anonymous, handwritten notes purportedly from this meeting that he attributes (apparently without basis) to Pratt. (Id. ¶ 29; Pl.'s Summ. J. Opp'n Mem., Doc. No. 21-2, at 5-6; Pl.'s Sur-Reply, Doc. No. 28 at 12.) The notes include the phrases "issues outside work," "bad attendance," "lack of reliability," "lack of on time if at all," and "no longer have FMLA not gonna get it back." (Pl.'s Mot. Opp. Summ. J., Ex. F, Doc. No. 21-9.) Fisher has not authenticated the notes; Pratt denies they are hers. (Def.'s Resp. to Pl.'s CSOF ¶ 29; Pratt Dep. 110:20-24.)

At the grievance hearing, Fisher admitted that he had mischarged his time and that he did so to hide his poor attendance. (Def.'s SOF ¶ 163; Def.'s Mot. Summ. J., Ex. E, Doc. No. 17-7 ¶ 32; Ex. SS, Doc. No. 17-47.) The Union stated that Fisher would never do so again if he were allowed to return to work. (Def.'s Mot. Summ. J., Ex. SS.) Neither the Union nor Fisher criticized Pratt, who was present but said nothing. (Def.'s SOF ¶¶ 164, 165; see also Def.'s Mot. Summ. J. Ex. SS.)

On June 21, 2023, Boeing issued a letter denying the Union's grievance, writing, in relevant part:

> During the discharge hearing, the union and Mr. Fisher described issues outside the workplace that influenced him arriving to work after start of shift. Mr. Fisher's and the union's candor in this matter is appreciated. However, sincerity after-the-fact cannot excuse his blatant and excessive theft of time, aggravated further by his charging to government contracts.

Mr. Fisher had other options such as using his benefits, leave of absence, or family medical leave, all of which he has done before when he was unable to be at work.

His behaviors clearly violated [Boeing's Labor Recording Practices Policy], which defines the requirements and responsibilities for all Boeing employees regarding labor recording practices. He was or should have been well-aware that significant disciplinary action, up to and including termination, was a likely outcome should his intentional and excessive mischarging be discovered.

Respectfully, Mr. Fisher was appropriately discharged for cause.

(Def.'s Mot. Summ. J., Ex. TT, Doc. No. 17-48.) The Union did not seek to arbitrate this decision. (Def.'s SOF ¶ 167.)

### *Comparators*

Boeing has disciplined other employees who made fraudulent time entries. Only one was a Sheet Metal Assembler: Vincent Broomall, who mischarged 11 hours—comprising 11% of his time over two weeks—and was suspended without pay for five days. (Pl.'s Mot. Opp. Summ. J., Ex. L, Doc. No. 24-2; see also id. Ex. M, Doc. No. 24-3; Def.'s Mot. Summ. J., Ex. ZZ, Doc. No. 19-23.) Broomall has taken FMLA leave on four occasions and is still employed by Boeing. (Def.'s SOF ¶ 172; Def.'s Mot. Summ. J., Ex. U, Doc. No. 19-17.) Other employees who were not Sheet Metal Assemblers were similarly disciplined: one employee who mischarged 17% of his time was suspended for five days without pay; another who mischarged 12.9% of his time was given a one-day suspension without pay. (Pl.'s Mot. Opp. Summ. J., Ex. L; Ex. N, Doc. No. 24-4; Ex. O, Doc. No. 24-5.) Another employee, who was not a Sheet Metal Assembler, mischarged 58.9% of his time and was terminated. (Pl.'s Mot. Opp. Summ. J., Ex. L.)

## II.    PROCEDURAL HISTORY

Fisher filed suit in the District of New Jersey, alleging: (1) "Discrimination and Disparate Treatment – Wrongful Termination" under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; (2) "Discrimination and Disparate Treatment – Wrongful Termination" under the ADA; (3) Retaliation under the ADA; (4) Interference and Retaliation under the FMLA; (5) "Age and Disability Discrimination and Retaliation" under New Jersey state law; and (6) "Interference and Retaliation" under New Jersey state law.  (Doc. No. 1.)

After the case was transferred to this District, Boeing moved for summary judgment on all claims.  (Doc. Nos. 5, 17.)  On the morning that Boeing filed its Motion, Fisher offered to withdraw his state law claims (almost five months after Boeing had requested this).  (Doc. No. 21-5). Although he now opposes the grant of summary judgment, Fisher has withdrawn the state law claims, and does not oppose dismissal of "Count One (age discrimination), [and] interference with the FMLA in Count Four."  (Pl.'s Summ. J. Opp'n Mem. at 1.)  Accordingly, Fisher's remaining claims are: "disability discrimination (<u>Count Two</u>), disability retaliation (<u>Count Three</u>), and retaliation in violation of the Family and Medical Leave Act ("FMLA") (<u>Count Four</u>)."  (<u>Id.</u>)

The matter is fully briefed.  (Doc. Nos. 27, 28.)

## III.    STANDARDS

### A.  Summary Judgment

Upon motion of any party, summary judgment is warranted "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of any genuine issue of material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  An issue is material only if it could affect the result of the suit under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986). The district court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If the court then determines that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. See Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

### B. Discrimination and Retaliation

Fisher bases his remaining ADA and FMLA claims on circumstantial evidence. (See Pl.'s Summ. J. Opp'n Mem. at 3.) Accordingly, I must apply the McDonnell Douglas burden-shifting framework:

> [The] plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.

Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014) (citations omitted); see also Capps v. Mondelez Glob., LLC, 847 F.3d 144, 156 n.12 (3d Cir. 2017) (claims of ADA discrimination, ADA retaliation, and FMLA retaliation are all subject to McDonnell Douglas burden-shifting).

### IV. DISCUSSION

Fisher fails to make out a prima facie case for any of his claims. Even if he could do so, he fails to demonstrate that Boeing's stated reason for firing him was pretextual. I will thus grant summary judgment to Boeing on these alternative grounds.

### A. ADA Disability Discrimination

To establish the prima facie elements, the plaintiff must show that:

> (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998)).  Boeing argues that Fisher has not made out an adverse employment decision because of discrimination.  (See Def.'s Summ. J. Mem., Doc. No. 17-1, at 11.)  I agree.

Fisher argues primarily that he has shown that Pratt had a discriminatory motive to fire him.  (Pl.'s Summ. J. Opp'n Mem. at 5.)   As I discuss below, however, Pratt did not make the decision to fire him.  Moreover, although she disliked Fisher and thought he was a poor employee, Pratt took no adverse action for an improper motive.

Fisher was fired by a four-person Employee Corrective Action team (that did not include Pratt) after an independent ethics inquiry by investigator Brian Jones.  Fisher has submitted no evidence that either the ECA team or Jones had a discriminatory motive.  To the contrary, Fisher does not believe Jones was trying to "get rid" of him.  (Fisher Dep. 195:24-196:3.)  Further, Boeing has submitted unrebutted evidence that the ECA team did not discuss Fisher's disability when making the decision to fire him.  (Def.'s Mot. Summ. J., Ex. C, Doc. No. 17-5, ¶ 27.)  Fisher nonetheless urges "cat's paw liability": that Pratt's purportedly improper motivation carried over to those who, acting neutrally, took adverse action against him.  (See Pl.'s Mot. Opp. Summ. J. at 10-11; Pl.'s Sur-Reply at 6-8.)  There is no evidence, however, that Pratt influenced the neutral parties that took adverse action against Fisher: Jones (who determined that Fisher had stolen time); the ECA team (which fired him); or the Union (which declined to arbitrate his firing).  Compare McKenna v. City of Philadelphia, 649 F.3d 171, 179 (3d Cir. 2011).  In a strikingly similar case— where an employee fired for "timesheet fraud" alleged that her supervisor's discriminatory animus tainted her termination decision—the Third Circuit ruled that the firing was permissible:

> [P]roximate cause is required in cat's paw cases, and that requires "some direct relation between the injury asserted and the injurious conduct alleged" and excludes links that are "remote, purely contingent, or indirect."

Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 330 (3d Cir. 2015) (quoting Staub v. Proctor Hosp., 562 U.S. 411, 419 (2011)).  Just as in Jones, the Plaintiff here cannot show that his poor relationship with one of his supervisors was the proximate cause of his firing.  See id. at 331.  Accordingly, just as in Jones, the decision to fire the Plaintiff here was permissible.

Finally, even if Fisher could show that Pratt somehow influenced the ECA team, Jones, or the Union, he cannot show that she had any discriminatory animus.  (See Def.'s SOF ¶ 86.)  Fisher seeks to infer discriminatory animus from Pratt's referral of two or three disabled workers—Fisher, Neri, and (as alleged by Fisher) Sam Ramble—for intakes; that she made a "stray remark remote in time unrelated to the termination decision . . . which could be interpreted as discriminatory" to Neri; that Fisher was "underutilized" while he was receiving work from Pratt; and that Pratt rejected Fisher's help changing a tire but accepted help from another employee.  (Pl.'s Summ. J. Opp'n Mem. at 4.)

This evidence does not create an inference that Pratt referred Fisher for an "intake" for discriminatory reasons.  To make out such an inference, Fisher must show that an adverse employment action, "if otherwise unexplained, [is] more likely than not based on the consideration of impermissible factors."  Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995).  He fails to do so.  Under the Boeing Code of Conduct, Pratt was obligated to "promptly report any illegal, improper, or unethical conduct to [her] management or through other appropriate channels."  (Def.'s Mot. Summ. J., Ex. M, Doc. No. 17-15; see also Def.'s SOF ¶ 67.)  Fisher ignores that Pratt requested the intake only after Rehawi—Fisher's first line supervisor—also following the Code, told her of discrepancies in Fisher's time records.  (Def.'s Mot. Summ. J., Ex.

JJ ¶¶ 4, 9, 13; Pratt Dep. 101:1-102:6; 102:24-103:2.)  Moreover, Fisher offers no evidence that the intakes of the other employees related to their disabilities.  Pratt's comment to Neri does not make out a discriminatory animus.  (See Pl.'s Mot. Opp. Summ. J., Ex. I ¶ 16.)  Indeed, Fisher acknowledges that "stray remarks . . . unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision."  (Pl.'s Summ. J. Opp'n Mem. at 4 (quoting Garvin v. Progressive Cas. Ins. Co., No. 08-3758, 2010 WL 1948593, at *6 (E.D. Pa. May 10, 2010)).)  Further, it is undisputed that Fisher was identified as "underutilized" when Boeing had already begun reducing the size of its workforce due to production slowdowns.  (Pl.'s CSOF ¶ 10.)  Even in its totality, this evidence does not make out an inference that Pratt harbored any discriminatory animus.

Fisher also refers to the handwritten notes purportedly prepared prior to Fisher's grievance hearing.  (Pl.'s Summ. J. Opp'n Mem. at 5-6.)  The notes include phrases respecting Fisher's poor attendance and his exhaustion of FMLA leave.  (Pl.'s Mot. Opp. Summ. J., Ex. F.)  Without providing any evidentiary basis, Fisher attributes these remarks to Pratt, urging that they "show what Ms. Pratt was adding to the process and most is related to [his] disability."  (Pl.'s Summ. J. Opp'n Mem. at 5.)  I disagree.  The notes do not make out discriminatory animus.  Fisher himself acknowledged his poor work attendance, which could not be attributed to FMLA leave, which he had exhausted.  (See Fisher Dep. 122:13-21, 248:8-19.)

Finally, Fisher cannot show that whatever Pratt's motivation, she caused him to suffer any adverse employment action.  His suggestion that Pratt's submission of the intake request was an adverse employment action will not do.  (Pl.'s Summ. J. Opp'n Mem. at 5.)  "An adverse employment action under a disability discrimination claim is any action taken by the employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or

privileges of employment.'" Schneider v. Works, 223 F. Supp. 3d 308, 317–18 (E.D. Pa. 2016) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)). Submitting the intake request—which was required under the Boeing Code of Conduct—did not affect Fisher's employment status. The Jones investigation and the ECA review also preceded his termination—the only adverse employment action he suffered.

### B. ADA Retaliation Claim

To make out a prima facie case, Fisher must show:

(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.

Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).

Boeing urges that Fisher never engaged in a protected activity. (Def.'s Reply, Doc. No. 27, at 5.) I disagree. FMLA leave can qualify as an ADA protected activity when an employer knows, or has reason to know, that the leave is not based on a one-time event. Thomas v. Brandywine Hosp., LLC, No. 21-3288, 2021 WL 5906350, at *3 (E.D. Pa. Dec. 14, 2021). Fisher took three FMLA leaves from 2017 to 2023. Although "the knowledge of other employees should not be imputed to those responsible for making the decision at issue," the ECA team that terminated Fisher must have been aware of his FMLA leave, given that Jones' report, which the ECA team relied upon, mentions that Fisher had chronic health issues and had previously taken FMLA leave. Curran v. Se. Pa. Transp. Auth., 2015 WL 1542290, at *6 (E.D. Pa. Apr. 7, 2015); (Def.'s Mot. Summ. J., Ex. EE at *3-5.)

Although Fisher can thus make out protected activity, he cannot make out causation. Courts addressing causation typically focus on evidence of two main factors: timing and ongoing antagonism. Hatch v. Franklin County., 755 F. App'x 194, 200 (3d Cir. 2018). Courts may also "look to 'a broad array of evidence' to determine causation." Gavurnik v. Home Properties, L.P.,

227 F. Supp. 3d 410, 420–21 (E.D. Pa.), aff'd, 712 F. App'x 170 (3d Cir. 2017) (citing LeBoon v. Lancaster Jewish Cmty. Cty. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)).

Fisher's last period of FMLA leave "expired March 27, 2023 and he was placed under investigation on May 11, 2023, which is about 44 days or 6 weeks apart." (Pl.'s Summ. J. Opp'n Mem. at 9-10.) Fisher acknowledges that "[t]o be unusually suggestive the Courts have generally considered action in days and not weeks." (Id. at 10 (citing Dove v. Comm. Ed. Ctrs., Inc., No. 12-4384, 2013 WL 6238015 (E.D. Pa. Dec. 2, 2013).) As to the second factor, Fisher provides no evidence of ongoing antagonism between him and Jones, the ECA team, or the Union.

Once again, Fisher urges cat's paw liability, arguing that Pratt "had retaliatory animus toward [Fisher] and she influenced the termination." (Id. at 13.) First, as I have discussed, because the undisputed evidence shows that Pratt did not influence Jones, the ECA team, or the Union in any way, Fisher cannot make out cat's paw liability. Jones, 796 F.3d at 331 ("[P]roximate cause will not exist when the employer does not rely on the 'supervisor's biased report' in taking the ultimate adverse action.").

In any event, the record undoubtedly shows that although Pratt thought Fisher was an unreliable employee because of his poor attendance and lateness—failings Fisher himself acknowledged—she did not discriminate against him. (See Fisher Dep. 122:13-21, 248:8-19.) Evidence that Pratt disliked Fisher does not make discriminatory or retaliatory animus. Ashelman v. Geisinger Health Sys. Found., No. 16-1837, 2018 WL 3827155, at *12 (M.D. Pa. July 18, 2018) (Supervisor's "jealousy and personal dislike of the plaintiff for reasons having nothing to do with her mental health . . . thoroughly rebut[s]" ADA and FMLA claims); see also Okokuro v. Pa. Dep't of Welfare, No. 00-2044, 2001 WL 868665, at *3, 6 (E.D. Pa. May 15, 2001) (Supervisor's "treatment of [plaintiff] was not the result of discriminatory animus, but rather [the supervisor's]

obvious personal dislike for [plaintiff].”); <u>Smart v. Cnty. of Gloucester</u>, 681 F. Supp. 3d 306, 321

(D.N.J. 2023) (“[P]ersonal dislike is not a forbidden retaliatory animus.”); <u>Roberts v. Randstad N.</u>

<u>Am., Inc.</u>, 231 F. App’x 890, 896 (11th Cir. 2007) (“[D]islike alone is not evidence of

discrimination.”).

### C.  FMLA Retaliation

Fisher “must show that (1) he invoked his right to FMLA-qualifying leave, (2) he suffered

an adverse employment decision, and (3) the adverse action was causally related to his invocation

of rights.” <u>Capps</u>, 847 F.3d at 152 n.6.  Fisher once again fails to make out causation.

As it has with ADA retaliation, the Third Circuit “has focused on two main factors in

finding the causal link necessary for [FMLA] retaliation: timing and evidence of ongoing

antagonism.” <u>Id.</u> (quoting <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 288 (3d Cir.

2001)).  Once again, “those are not the only two ways to do so; ‘a plaintiff may rely upon a broad

array of evidence’ to show the necessary causal link.” <u>Troiano v. County of Allegheny</u>, No. 16-

595, 2017 WL 1406901, at *1 (W.D. Pa. Apr. 20, 2017) (citing <u>Farrell v. Planters Lifesavers Co.</u>,

206 F.3d 271, 284 (3d Cir. 2000)).  As I have discussed, Fisher offers no evidence of this link.  He

thus fails to make out the causal element of FMLA retaliation for the same reasons he could not

make out the causal element of his ADA retaliation claim.

### D.  Legitimate, Non-Pretextual Reason for Fisher’s Firing

Fisher has not made out a prima facie case for any of his claims.  Even if he had, those

claims would still fail.  Boeing easily carries its “relatively light” burden to demonstrate that it had

a legitimate reason to fire Fisher.  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  Fisher

admits that he mischarged over 27.9% of his time over the period reviewed by Jones and the ECA

team.  (<u>See</u> Def.’s SOF ¶ 126-33; Pl.’s Resp. to Def.’s SOF ¶ 126-33.)  He nonetheless argues that

this was merely a pretextual reason for his firing.  (See Pl.'s Summ. J. Opp'n Mem. at 6-8, 13-14.)
I disagree and will grant summary judgment to Boeing on this alternative ground.

To establish pretext, Fisher must offer evidence that would persuade a reasonable juror
either to: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an
invidious discriminatory reason was more likely than not a motivating or determinative cause of
the employer's action." Fuentes, 32 F.3d at 764.  He has not offered evidence to satisfy either
prong.

In explaining why the ECA team decided to fire Fisher, member Kathryn Lewis submitted
an affidavit in support of Boeing's Summary Judgment Motion explaining that:

> Boeing has developed the following disciplinary practice for time recording violations
> based on the percentage of mischarged time uncovered during a Corporate Investigation:
> less than 10% - written warning, between 11% - 19% Time off From Work Suspension, and
> 20 or greater % - discharge.

(Def.'s Mot. Summ. J., Ex. C ¶ 23.)  Although Fisher testified that he was unfamiliar with this
practice, he offers no evidence to dispute its existence.  (See Def.'s Reply to Pl.'s Resp. to Def.'s
SOF, Doc. No. 27-1, ¶ 141.)  Rather, he argues—to make out the first Fuentes prong—that because
the practice was not reduced to writing, it never existed.  (Pl.'s Resp. to Def.'s SOF ¶ 138; Pl.'s
Sur-Reply at 2, 10.)  Yet, as I have discussed, and discuss again below, the discipline imposed on
Fisher's "comparators" is consistent with the practice.  The only comparator who was fired was
the only comparator who stole more than 20% of his time.  (Pl.'s Sur-Reply at 10, 12; Pl.'s Mot.
Opp. Summ. J., Ex. L.)

Moreover, as I have discussed, Fisher does not contest that Boeing had a written Policy
providing that "[e]mployees falsifying labor charging or managers who knowingly approve such
falsifications are subject to company disciplinary action . . . and possible civil and/or criminal
liabilities."  (Def.'s Mot. Summ. J., Ex. J at 4.)  It is also undisputed that Fisher received annual

training on this Policy. (See Def.'s Mot. Summ. J., Ex. K (Fisher attended "Labor Recording Compliance Training" on sixteen occasions).) That Policy certainly provides a valid basis for terminating Fisher, who admitted to "falsifying labor charging." (See Def.'s Mot. Summ. J., Ex. J at 4.) Presumably, that is why the Union chose not to arbitrate the termination. (See Def.'s SOF ¶ 167.)

To demonstrate pretext, Fisher must put forward "evidence contradicting the *core facts* put forward by the employer as the legitimate reason for the decision." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006). The Parties do not dispute the "core fact" that Fisher mischarged almost 30% of his time on a series of government contracts. (See Def.'s SOF ¶ 126-33; Pl.'s Resp. to Def.'s SOF ¶ 126-33.) That Fisher believes his termination was an unduly harsh penalty for his admitted dishonesty is beside the point. First, Fisher himself admitted that he altered his time records because he believed his poor attendance alone would result in his firing. (Fisher Dep. 248:8-249:18.) Presumably, that is why, once his time fraud was discovered, Fisher told Buchanan "it's probably to[o] late now" to take corrective action. (Def.'s Mot. Summ. J., Ex. OO.) Moreover, my role is not to be a "'a super-personnel department' tasked with correcting unduly harsh employment actions." Klimek v. United Steel Workers Loc. 397, 618 F. App'x 77, 80 (3d Cir. 2015). I am "instead concerned with whether the reasons for such actions are pretextual." Id. Firing Fisher because he stole almost 30% of his time working on government contracts was thus permissible. The first prong of the Fuentes test "places a difficult burden on the plaintiff," which Fisher does not meet. Fuentes, 32 F.3d at 765.

As to the second prong, a plaintiff may refer to how "the defendant has treated similarly situated . . . individuals [outside of the plaintiff's protected group] more favorably." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 645 (3d Cir. 2015). Fisher here points to

Broomall, who, like Fisher, was a Sheet Metal Assembler, and who was suspended without pay for five days for misrecording 11% of his time (a total of eleven hours) over a two-week period. (Def.'s SOF ¶¶ 171-175.)  Fisher argues that Broomall is "a comparator" who was "treated better than him over the same violation."  (Pl.'s Sur-Reply at 10.)

This argument fails for several reasons.  First, Broomall is an inapposite comparator for Fisher's FMLA retaliation claim and may be an inapposite comparator for his ADA retaliation claim.  Like Fisher, Broomall requested FMLA leave on multiple occasions.  (Def.'s Mot. Summ. J., Ex. U.)  Broomall thus is not outside Fisher's protected group and cannot be a comparator for Fisher on his FMLA retaliation claim.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998) ("[T]he plaintiff may show that . . . the employer has treated more favorably similarly situated persons *not within* the protected class.") (emphasis added).  If Broomall took FMLA leave because he has an ADA-qualifying disability, then Broomall may also be an inapposite comparator for Fisher's ADA retaliation claim for the same reason.

Second, to the extent that Broomall is a proper comparator for any claim, evidence of the more favorable treatment of a single member of a non-protected group is usually insufficient to establish pretext.  Simpson, 142 F.3d at 642 ("[A] plaintiff does not create an issue of fact merely by selectively choosing a single comparator who was allegedly treated more favorably, while ignoring a significant group of comparators who were treated equally to her."); Willis, 808 F.3d at 650 ("[W]hile this Court has acknowledged that evidence demonstrating that a single member of a non-protected group received more favorable treatment can be relevant, '[a] decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently.'") (quoting Simpson, 142 F.3d at 645-46; see also Nichols v. Bennett Detective & Protective Agency, Inc., 245 F. App'x 224, 230 (3d Cir. 2007) ("It

is not 'that evidence of the more favorable treatment of a single member of a non-protected group is never relevant, but rather that the evidence can not be viewed in a vacuum.'") (quoting <u>Simpson</u>, 142 F.3d at 646).

Third, Broomall was not treated more favorably than Fisher. Broomall was suspended without pay because he stole 11% of his time. (Pl.'s Mot. Opp. Summ. J., Ex. L.) As I have discussed, Fisher was fired because he stole close to 30%. (<u>Id.</u>)

Fisher also refers to two of Boeing's other employees—Ryan Langley and Patrick Schauer—who recorded "17% questionable hours with [a] five-day suspension" and "12.9% with [a] one-day suspension." (Pl.'s Summ. J. Opp'n Mem. at 14.) These comparisons also fail. A proper comparator must be similar "in all relevant respects" to the plaintiff, considering such factors as "a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct" that led to inequitable discipline. <u>Opsatnik v. Norfolk S. Corp.</u>, 335 F. App'x 220, 223 (3d Cir. 2009). Fisher has not shown such similarities with these two employees. Neither was a Sheet Metal Assembler; neither was supervised by Buchanan. (Pl.'s Mot. Opp. Summ. J., Ex. L.) Nor has he shown that either committed time fraud while working on government contracts. (<u>See</u> Pl.'s Mot. Opp. Summ. J., Exs. N, O.)

In these circumstances, Fisher has not made out the second <u>Fuentes</u> factor, and so has not made out pretext. I am thus compelled to conclude that Boeing had a legitimate, non-discriminatory reason for firing Fisher.

## V.    CONCLUSION

The undisputed evidence shows that John Fisher was not a model employee.  He has acknowledged that his FMLA leave aside, his attendance was poor, and that he tried to defraud Boeing when he worked on a government contract.  Boeing's decision to fire Fisher was thus permissible.  Accordingly, I will grant the Company's Motion for Summary Judgment.

An appropriate Order follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

Paul S. Diamond, J.